MAYO v. GREAT LAKES GREYHOUND LINES.

1. LABOR—MAJORITY VOTE—APPROVAL OF AGREEMENT WITH UNION.
   Return of 101 votes of union members in favor of approving an agreement between employer and union officers as against 62 opposed thereto expressed will of a majority of those voting by mail on proposition.

2. SAME—APPROVAL OF UNION AGREEMENT—INTRA-UNION APPEAL PROCEDURE.
   Vote of 11 to 7 in favor of approving union officers' agreement with employer as to seniority rights among employees of transportation corporation which had acquired a competing line constituted final action, where intra-union appeal procedure was not used to review action taken.

3. SAME—EQUITY INTERFERENCE.
   It is not the business of an equity court to assure union members that their union affairs shall be conducted in a thoroughly democratic manner, especially where intra-union appeal procedure has not been used to review action taken.

4. SAME—INJUNCTION—INTRA-UNION APPEAL PROCEDURE.
   Dissatisfied members of union whose officers had made an agreement with employer respecting. seniority rights and which had been approved at a mass meeting and later by a mail vote of entire membership, were not entitled to injunction against enforcement of the agreement, where they had not exhausted all of their remedies within the union before applying to the court for relief and the constitution and bylaws of the union expressly require exhaustion of intra-union procedure before resorting to court.

REFERENCES FOR POINTS IN HEADNOTES
[4] 31 Am Jur, Labor §§ 51, 112, 123.
[4] Collective labor agreements. 95 ALR 10, 52, 53.

Appeal from Wayne; Murphy (Thomas J.), J. Submitted February 7, 1952. (Docket No. 99, Calendar No. 45,310.) Decided April 7, 1952.

Bill by Lester Mayo and others against Great Lakes Greyhound Lines, a division of the Greyhound Corporation, a Delaware corporation, and Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America, Division 1303, a voluntary association, to enjoin the reception of bids under "run guide." Bill dismissed after hearing. Plaintiffs appeal. Affirmed.

*Walter M. Nelson*, for plaintiffs.

*Matheson, Dixon & Brady* (*Edmund M. Brady* and *Frank C. Aldrich, Jr.*, of counsel), for defendant Greyhound.

*Ralph W. Cole*, for defendant union.

NORTH, C. J. This case involves a dispute between rival factions of Division 1303 of the Amalgamated Association of Street, Electric Railway & Motor Coach Employees of America. The division or local will hereinafter be referred to as Division 1303. The dispute concerns seniority rights as between drivers in the Dayton (Ohio) district and the Detroit district, so-called.

On July 1, 1947, the Great Lakes Greyhound Lines acquired by merger, control of the Cincinnati & Lake Erie Transportation Company (hereinafter termed C.&L.E.). Prior to C.&L.E. acquisition by Greyhound, both the employees of C.&L.E. and those of Greyhound had contracts with their respective employers in regard to seniority rights within their respective groups. At the time of acquisition a problem arose as to the seniority rights of the former

C.&L.E. employees, who then became Greyhound employees. The contract then in force between Greyhound and Division 1303 contained a stipulation in part I, article 10, § 8, which provided:

"If, in acquiring a bus line which lies adjacent to and not paralleling existing lines of the company, regularly assigned operators already employed on such line are acquired, and accepted for employment by the company, they will retain seniority rights earned on such line or lines upon which they are already employed, but in no event will they exercise seniority beyond their respective division points, and in addition shall acquire seniority rights on lines of the company as of the date of acquisition. Operators affected thereby will thereafter carry seniority dates showing their rank on each line. Operators acquiring seniority on other lines shall rank themselves in accordance with their respective ratings held before such additional lines were acquired. Company will use its best efforts to transfer district seniority rights of operators, desiring to transfer on any division of that company which may be sold."

Since many of the C.&L.E. lines were parallel to existing Greyhound lines (in fact in most cases they ran over the same routes as Greyhound lines) the provisions of section 8 would have had the effect, as to many of the former C.&L.E. drivers, of wiping out all their seniority acquired with the C.&L.E. prior to its acquisition by Greyhound. This effect was resisted by the C.&L.E. group of drivers. As a compromise between this C.&L.E. group, most of whom worked out of the Dayton district, and the other members of Division 1303, most of whom worked out of the Detroit district, an agreement was reached whereby drivers on runs originating in Dayton constituted one seniority group, and those on runs originating in Detroit constituted a separate seniority group. Thus the drivers on runs originat-

ing in one district could not exercise seniority in regard to runs originating in the other district. This arrangement never completely settled the problem, for it appears there was still considerable discussion and agitation among the members of Division 1303 continuing right up to the time of this suit. We do not deem it necessary to go into the merits or demerits of this controversy in order to dispose of the instant case.

As an outgrowth of this seniority problem, a formal grievance was filed with the officers of Division 1303, which grievance charged that the Dayton group had failed to abide by section 8 of the contract between Division 1303 and Greyhound, above quoted. Thereafter many meetings were held between the officials of Division 1303 and Greyhound. Those meetings culminated in a stipulation, entered into on May 28, 1951, between Greyhound and the officials of Division 1303, which provided:

"That former employees of Cincinnati & Lake Erie Transportation Company shall commence to acquire seniority as of the date of acquisition, July 1, 1947, of said company by Great Lakes Greyhound Lines, in the Detroit seniority district as identified in section 4, article 10 of an existing labor agreement between the parties hereto;

"That employees of Great Lakes Greyhound Lines now exercising seniority in the Detroit District as identified in section 4, article 10 of the labor agreement referred to above, shall commence to acquire seniority as of the acquisition date referred to in paragraph 1 above, in the Dayton seniority district as identified in section 5C of article 10 of the labor agreement above referred to."

On June 11, 1951, Greyhound opened up a number of runs for bidding under this new seniority provision contained in the stipulation of May 28, 1951, just above quoted. The run bids were to become effective

at 12:01 a.m. on June 22, 1951. On June 16, 1951, plaintiffs, 61 in number, members of Division 1303, filed a bill in chancery in Wayne county seeking to enjoin Greyhound and Division 1303 from putting into effect the stipulation of May 28, 1951, and alleging that said stipulation was in violation of the existing contract between Division 1303 and Greyhound. On the same day a show cause order and a temporary restraining order were issued by the court. Both Greyhound and Division 1303 filed motions to dismiss the bill of complaint, and on July 3, 1951, an order was issued denying the motions to dismiss and continuing the temporary restraining order. An answer was filed by Greyhound and also by Division 1303. Plaintiffs filed replies to the answers. On August 20th, Division 1303 filed a motion for dissolution of the temporary restraining order, and on the same day plaintiffs filed an answer to this motion. The above motion was brought on to be heard and testimony was taken. At the conclusion of the proofs the court was of the opinion that the plaintiffs had not made out a case for relief, and expressed an intention to grant the motion of defendant Division 1303 to dissolve the restraining order. At the request of plaintiffs' attorney, or at least with his approval, the court consented to enter an order dismissing the bill instead of an order dissolving the injunction, so that the plaintiffs would have a final order from which to appeal. From that order this appeal was taken.

It is appellants' contention on this appeal that the trial court erred in finding that the stipulation of May 28, 1951, was binding on the membership of Division 1303 included in the Dayton and Detroit rosters. The appellees assert that the trial court's decision was correct because the stipulation of May 28, 1951, had in effect been voted upon at a "mass meeting" held on March 20, 1951. The particular

question voted on at that meeting was whether the membership approved of the action taken by the Division's executive board on a grievance filed on August 28, 1950. This grievance complained that article 10, § 8, above quoted, was not being enforced. It seems that when the first contract was negotiated between Greyhound and Division 1303 after the merger of C.&L.E. with Greyhound, article 10, § 5, was put in the contract in order to compromise the conflicting demands as to seniority made by the Dayton group of drivers and the Detroit group. Section 5 of article 10 provided:

"With respect to the Detroit and Dayton seniority districts, a master roster shall be built to show company seniority as master seniority.

"(a) District seniority may be exercised on the basis of master roster in the event of furlough, although employee shall have right to take furlough in his district instead of such transfer.

"(b) Employee on recall to his seniority district must return as required under regular recall procedure.

"(c) The Dayton district is entitled to all work on schedules originating and terminating in its district. Should work presently being performed between Toledo and Detroit be transferred to the Dayton district, members of the interurban roster shall be entitled to follow such work to the Dayton district with full seniority."

On their face, sections 5 and 8 seem to be somewhat in conflict. The real object of the grievance seemingly was to have section 8 enforced in preference to section 5. Appellees contend that sections 5 and 8 are not in conflict if properly construed. Be that as it may, nevertheless among the 2 groups within Division 1303 there was disagreement as to just what the effect of these 2 sections should be. The grievance filed tended to bring this dispute to

a head.   Prior to the mass meeting of March 20, 1951, the officers of Division 1303 had been negotiating with Greyhound in regard to this dispute and had come to some sort of an agreement as to the seniority problem and the controversy over sections 5 and 8.   This agreement (the record does not show what this agreement was except to say that it was embodied in the stipulation of May 28, 1951, between the company and the union) was considered by the union officers who negotiated it with Greyhound, to be a satisfactory settlement of the problem raised by the grievance filed August 28, 1950. Consequently, on March 20, 1951, at a regular mass meeting, 28 members being present (25 members constituted a quorum according to the Division's bylaws), the question of whether to affirm or disaffirm the disposition made of the grievance of August 28, 1950, was voted upon, and the vote was 11 to 7 for approval.   Following this vote of approval, the officers of Division 1303, the bargaining agent of plaintiffs, entered into the formal stipulation with Greyhound, on to-wit:   May 28, 1951, hereinbefore quoted.

It is this action on the part of the officers of Division 1303 which is challenged by the group of 61 members of Division 1303 in their bill of complaint. They assert that the vote taken at the March 20th mass meeting was an improper ballot of the membership, did not correctly represent the will of the majority, and that the entire meeting at which the vote was taken was arbitrarily and improperly conducted.

While the suit was pending, and prior to any testimony being taken on the motion to dissolve the temporary restraining order which had been issued when the bill of complaint was filed, a ballot was mailed to each of the members of Division 1303 whose name was on the Dayton and Detroit rosters.

This ballot specifically asked whether the member approved or disapproved of the agreement which had been entered into between Greyhound and the officers of Division 1303. In all 203 ballots were mailed. Of these 101 were returned marked "yes" (indicating approval) and 62 were returned marked "no" (indicating disapproval). Twenty-six of the ballots returned were not opened because they were ballots of men employed subsequently to the stipulation of May 28, 1951. These 26 were opened in court and the record shows that 25 were marked "no" and 1 was marked "yes." The remaining 14 ballots were either not delivered, not returned, or disqualified because the member was then on supervision or in the military service. In any case it is clear that a majority of the ballots voted were marked "yes."

Appellants contend that this ballot vote was absolutely void because no meeting was called for purposes of discussing the proposal and no time was allowed for discussion. Further, that the question was unfairly stated on the ballot and the list of voters was unfairly and arbitrarily chosen by the officers who prepared and sent out the ballots.

We agree with the trial judge who was of the opinion that the ballot taken by mail expressed the will of the majority of the members of Division 1303 who were involved in the instant controversy. Further, for reasons about to be noted, we think the trial judge would have been right in dismissing the bill of complaint even if the ballot by mail had not been taken. Even if it should be assumed that the election of March 20th was not in character thoroughly democratic, and that it did not result in a fair expression of all concerned; still the record shows that a vote was taken and that 11 out of 18 who participated voted to affirm the action that had been taken by the executive board incident to the grievance of

which plaintiffs complain. And it is important to note that if this determination was not fairly arrived at, the constitution and general laws of the union provided a method whereby the matter could have been appealed within the framework of the union. It is not the business of an equity court to assure union members that their union affairs shall be conducted in a thoroughly democratic manner.

"When the bylaws of fraternal organizations, if reasonable and valid, provide a mode for determining when relief shall be given or denied to members by tribunals provided for therein, redress therefor may not be sought in the courts. (Citing numerous cases.)" *Ryan* v. *New York Central R. Co.,* 267 Mich 202, 209.

Regardless of any of the claimed irregularities in the earlier proceedings, the vote by mail of the union members named in the Detroit and in the Dayton rosters resulted in a final approval of the action taken by the union representatives. In announcing his conclusion at the close of the hearing, the trial judge stated:

"I will issue an order dismissing it (the bill of complaint), if you wish me to, on the grounds the matter has been settled by this vote and on the grounds the plaintiffs did not exhaust all of their remedies within the union before they applied to the court."

On each of the above grounds, dismissal was proper. Division 1303 was the bargaining agent of plaintiffs. As to seniority rights, as stated by the trial judge: "The contract (with the employer) is with the union and not the men, and the union through their representatives and a majority vote (of the union members concerned) may change the contract at any time." These plaintiff-employees were bound by the agreement made by their bargaining agent

with the Great Lakes Greyhound Lines and ratified by the vote taken by mail. Plaintiffs herein are not entitled to injunctive relief against defendants proceeding to render effective seniority rights in accord with such agreement. *Hartley* v. *Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express & Station Employees,* 283 Mich 201.

The trial court was also justified in dismissing plaintiffs' bill of complaint on the ground that plaintiffs could not resort to court action until they had exhausted "all of their remedies within the union before they applied to the court." Section 81 of the "Constitution and General Laws" under which the union and its members operate, provides in substance that any member or members of a local division feeling that they have been unlawfully dealt with by the local division have a right to appeal to the international president and the general executive board, and from the general executive board to the convention of the association, but that such members must not take legal action or go into court until they have exhausted all their rights within the association and have finally appealed to the convention. Plaintiffs did not before instituting this suit and obtaining a restraining order appeal from the action taken by Division 1303. Hence, the court did not have jurisdiction because plaintiffs as members of a voluntary association, under the circumstances of this case, were bound by the provisions of the union's constitution and general laws. *Ryan* v. *New York Central R. Co., supra; Harris* v. *Detroit Typographical Union,* 144 Mich 422.

In considering this appeal we have been mindful of plaintiffs' contention that the selection of those who were to vote on the proposition submitted was improper; that the ballots were improperly counted; that the ballot as taken was improper in that it lacked the essential elements of due process; and

plaintiffs' further contention "That for many years experience had established the impossibility of having a 'mass meeting' of the members entitled to vote on questions calling for a vote * * * without holding meetings for the discussion of said questions by divisions and *thereafter* submitting said questions to decision by written referendum by mail." After consideration of the above, and all other contentions of appellants, we are of the opinion that none of them would justify reversing the decree of the trial court. The controversy which gave rise to the instant litigation had been a matter of contention for many months between various parties interested in the question of seniority herein involved. The only employees concerned in the controversy were those whose names appeared as members of the union on the Detroit and Dayton rosters; and as to all such employees ballots in appropriate form were provided to them, and the result of the vote taken by mail was approval of the ruling of which plaintiffs herein complain.

The decree entered in the circuit court is affirmed, and appellees may have taxable costs of this Court.

Butzel, Carr, Bushnell, Sharpe, Boyles, and Reid, JJ., concurred with North, C. J.

Dethmers, J., concurred in the result.